Application of Harold E. BARNES, Officer in Charge of Immigration and Naturalization Service, for process to enforce subpoena as to Salvatore FALCONE.

Application of Harold E. BARNES, Officer in Charge of Immigration and Naturalization Service, for process to enforce subpoena as to Joseph FALCONE.

Edward J. SHAUGHNESSY, as District Director, Immigration and Naturalization Service, New York District, Petitioner-Appellant,

v.

John ODDO, Respondent-Appellee.

Nos. 20, 21, 76,

Dockets 23081, 23082, 23172.

United States Court of Appeals, Second Circuit.

Argued Nov. 5, 1954.

Decided Jan. 10, 1955.

---

Theodore F. Bowes, U. S. Atty. for Northern Dist. of New York, Syracuse, N. Y. (Charles J. Miller, Asst. U. S. Attorney, Syracuse, N. Y., of counsel; Herman I. Branse, Acting Dist. Counsel, Immigration and Naturalization Service, Buffalo, N. Y., on the brief), for applicant-appellant Harold E. Barnes.

Anthony S. Falcone, Utica, N. Y., for respondents-appellees Salvatore Falcone and Joseph Falcone.

J. Edward Lumbard, U. S. Atty. for Southern Dist. of New York, New York City (Harold J. Raby, Asst. U. S. Atty., and Lester Friedman, Atty., Immigration and Naturalization Service, New York City, of counsel, for petitioner-appellant Edward J. Shaughnessy.

Kaufman & Edelbaum, New York City (Maurice Edelbaum and Seymour Teitelbaum, New York City, of counsel), for appellee John Oddo.

Before CHASE, MEDINA and HINCKS, Circuit Judges.

MEDINA, Circuit Judge.

The sole question raised by these two appeals is whether Section 235(a)[1] of the Immigration and Nationality Act of 1952 (the McCarran-Walter Act), 66 Stat. 163, 198-9, 8 U.S.C.A. § 1225(a), authorizes an officer of the Immigration and Naturalization Service to issue a subpoena requiring a naturalized citizen to testify, in an effort to determine if "good cause" exists for the commencement of proceedings to revoke the order admitting such person to citizenship.[2]

In the cases of Salvatore Falcone and Joseph Falcone, the Officer in Charge of the Immigration and Naturalization

[1]. "Sec. 235. (a) The inspection, other than the physical and mental examination, of aliens (including alien crewmen) seeking admission or readmission to or the privilege of passing through the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers. All aliens arriving at ports of the United States shall be examined by one or more immigration officers at the discretion of the Attorney General and under such regulations as he may prescribe. Immigration officers are hereby authorized and empowered to board and search any vessel, aircraft, railway car, or other conveyance, or vehicle in which they believe aliens are being brought into the United States. The Attorney General and any immigration officer, including special inquiry officers, shall have power to administer oaths and to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, pass through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and, where such action may be necessary, to make a written record of such evidence. Any person coming into the United States may be required to state under oath the purpose or purposes for which he comes, the length of time he intends to remain in the United States, whether or not he intends to remain in the United States permanently and, if an alien, whether he intends to become a citizen thereof, and such other items of information as will aid the immigration officer in determining whether he is a national of the United States or an alien and, if the latter, whether he belongs to any of the excluded classes enumerated in section 212. The Attorney General and any immigration officer, including special inquiry officers, shall have power to require by subpena the attendance and testimony of witnesses before immigration officers and special inquiry officers and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and to that end may invoke the aid of any court of the United States. Any United States district court within the jurisdiction of which investigations or inquiries are being conducted by an immigration officer or special inquiry officer may, in the event of neglect or refusal to respond to a subpena issued under this subsection or refusal to testify before an immigration officer or special inquiry officer, issue an order requiring such persons to appear before an immigration officer or special inquiry officer, produce books, papers, and documents if demanded, and testify, and any failure to obey such order of the court may be punished by the court as a contempt thereof."

[2]. "Sec. 340. (a) It shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 310 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively * * *. If the naturalized citizen does not reside in any judicial district in the United States at the time of bringing such suit, the proceedings may be instituted in the United States District Court for the District of Columbia or in the United States district court in the judicial district in which such person last had his residence."

Service in Syracuse, New York, applied, on notice, to the United States District Court for the Northern District of New York for orders directing the Falcones, upon whom subpoenas had been served, and who challenged the authority of the Officer to issue the subpoenas under Section 235(a), to appear and testify. In the case of John Oddo the subpoena was issued by the District Director of Immigration and Naturalization for the New York District, Judge Dimock in the Southern District of New York made an ex parte order directing Oddo to appear and testify, and Oddo moved to vacate Judge Dimock's order. In each case it appeared that testimony was sought relative to the possibility of instituting an action in equity pursuant to the terms of Section 340 of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1451, for a decree of denaturalization, the Falcones having been admitted to citizenship in 1925, and Oddo in 1931. Judge Foley refused to direct the Falcones to appear and testify and Judge Weinfeld granted the motion to vacate, each holding that Section 235(a) authorized the issuance of subpoenas only in cases involving the entry, exclusion and deportation of aliens. The identical proposition was decided contrariwise by Judge Welsh, in the District Court for the Eastern District of Pennsylvania. In re Minker, 1953, 118 F.Supp. 264.

An "immigration officer" is defined in Section 101(a) (18) of the 1952 Act, 8 U.S.C.A. § 1101(18), as "any employee or class of employees of the Service or of the United States designated by the Attorney General * * * to perform the functions of an immigration officer specified by this Act or any section thereof"; and Section 101(b) (4) defines a "special inquiry officer" as any immigration officer "who the Attorney General deems specially qualified to conduct specified classes of proceedings * * * required * * * to be conducted by or before a special inquiry officer and who is designated and selected by the Attorney General * * *." The specified classes of proceedings referred

to are exclusion proceedings, Section 235(b), and deportation proceedings, Section 242(b), 8 U.S.C.A. § 1252(b). Without pausing to spell out the details, it will suffice to say that the established method of selecting these immigration and special inquiry officers gives assurance that they have had experience in miscellaneous phases of the work of the Immigration and Naturalization Service and possess a special competence and familiarity with the wiles and devices of those seeking in one way or another to defeat the purposes of and to evade the laws governing immigration and naturalization, which are complex and highly technical.

Those who performed analogous functions under the predecessor statute, The Immigration Act of 1917, were described in Section 16 thereof, the Section which as amended became Section 235(a) of the Act of 1952, as "immigrant inspectors." The heading of this old Section 16 reads: "Physical and Mental Examination of Alien Passengers; Regulations; Authorization of Inspectors to Administer Oaths; Appeal to Medical Boards and Personnel Thereof; Subpena of Witnesses and Documents; Penalty." There were no "Titles" or "Chapters" as in the subsequent 1952 Act.

Section 16 provided that, "Said inspectors (the immigrant inspectors) shall have power to administer oaths and to take and consider evidence touching the right of any alien to enter, reenter, pass through, or reside in the United States * * *" and that, "Any district director of immigration and naturalization designated by the Commissioner or any inspector in charge shall also have power to require by subpoena the attendance and testimony of witnesses before said inspectors and the production of books, papers, and documents touching the right of any alien to enter, reenter, reside in, or pass through the United States, and to that end may invoke the aid of any court of the United States; and any district court within the jurisdiction of which investigations are being conducted by an immigrant

inspector may \* \* \* issue an order requiring such person to appear \* \* \* and testify; and any failure to obey such order \* \* \* may be punished \* \* \* as a contempt." There is no dispute about the fact that the provisions just referred to constituted the authority and machinery for administrative investigations by the Service under the 1917 Act, and this authority was widely and continuously exercised.

The Revisers' Notes make it plain that the new Section 235(a) of the 1952 Act, pursuant to which the Falcone and Oddo subpoenas were issued, is the successor to the old Section 16 of the 1917 Act. The amendments are so specific and clear as practically to determine the issue before us. The "immigrant inspectors" are now "any immigration officer, including special inquiry officers," as defined supra, and they are given by Section 235 (a) power to administer oaths and to take and consider evidence "of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, pass through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service \* \* \*." And Section 235(a) proceeds to use identical language in connection with the power of "any immigration officer, including special inquiry officers" to "require by subpena the attendance and testimony of witnesses \* \* \* relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service." As in the old Section 16 the appropriate District Courts are to direct such witnesses to appear and testify and to punish a refusal to testify as a contempt; and Section 287(b), 8 U.S.C.A. § 1357(b), repeats the key phrase above quoted in describing the powers of immigration officers and employees in administering oaths and taking and considering evidence.

Thus certain officers of the Service, designated by the Attorney General, and undisputedly including those who issued the subpoenas in these cases now before us, were explicitly given increased administrative investigatory powers. The counterpart of the phrase appearing in the 1917 Act is strengthened and broadened by the addition of the words "of or from any person", and "or person he believes or suspects to be an alien"; and there is added, both in the part of the section relating to the administration of oaths and the taking and consideration of evidence and in that relating to the subpoena power and its enforcement by the District Courts, as well as in Section 287(b), the new and comprehensive words "or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service." Surely investigations of an administrative character, conducted by the very officials who by training and experience have expert knowledge of the whole subject of immigration and naturalization, and designed not merely to procure evidence to support a denaturalization proceeding under Section 340 of the Act, but to ascertain the true facts and in many if not most cases, exonerate those under investigation, are "concerning \* \* \* matter which is material and relevant to the enforcement" of the Act. True, the language is general, there is no specific reference to denaturalization proceedings; but the very generality of the terms of the statute compels the conclusion that the powers thus conferred may be exercised in reference to the enforcement of Section 340 of the Act, as well as that of all the rest. We are not at liberty to disregard language the import of which is so plain, simply because, in the allocation of "Titles," and "Chapters," and Section headings, the language conferring administrative investigatory powers is included in "Chapter 4—Provisions Relating to Entry and Exclusion" of "Title II—Immigration", and as part of a long section headed, "Inspection by Immigrant Officers." The historical relationship between the old

Section 16 of the 1917 Act and the new Section 235(a), as well as the perfectly clear character of the added words above referred to, and their iteration, completely rule out the possibility of inadvertence, confusion or ambiguity. And it is worthy of note that the Act of 1952 was not hastily thrown together. On the contrary, it is the result of years of patient study by experts thoroughly conversant with the long history of successive Acts affecting immigration and naturalization and allied matters, and having ripe experience with the practical problems with which the Service has had to grapple.

■ ■ The rule of construction applicable in such cases is well restated in Brotherhood of Railroad Trainmen v. Baltimore & O. R. Co., 1947, 331 U.S. 519, 528–529, 67 S.Ct. 1387, 1392, 91 L.Ed. 1646:

> "Where the text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most general manner; to attempt to refer to each specific provision would often be ungainly as well as useless. As a result, matters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles. Factors of this type have led to the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text. United States v. Fisher, 2 Cranch 358, 386, 2 L. Ed. 304; Cornell v. Coyne, 192 U.S. 418, 430, 24 S.Ct. 383, 385, 386, 48 L.Ed. 504; Strathearn S.S. Co. v. Dillon, 252 U.S. 348, 354, 40 S.Ct. 350, 351, 64 L.Ed. 607. For interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain."

It is said that a reading of the 1952 Act as an integrated whole demonstrates that Section 235(a) was intended to be limited to entry, exclusion and deportation. But our reading of the Act in its entirety leaves us with a contrary impression. Moreover, if Section 235(a) is to be applicable only to entry, exclusion and deportation, as held below, what becomes of the words "or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service"? Are these significant words to be left hanging in the air, as it were, and given no effect whatever?

Aside from the argument based upon the heading of Section 235(a) and the inclusion of the administrative subpoena power in Title II of the 1952 Act, relating to Immigration, and that concerning denaturalization proceedings in Title III on Nationality and Naturalization, the principal contentions of respondents stem from the difference in nature between administrative and judicial proceedings and the various provisions of the Act and the Regulations which implement it. Thus it is noted that, pursuant to the terms of Section 340, it is the duty of "the United States district attorneys for the respective districts" to institute "upon affidavit showing good cause therefor" proceedings seeking an order of denaturalization, that such proceedings are judicial in character, that the party thus sued shall have sixty days personal notice in which to answer the petition; and it is said that, if the subpoena power contended for here by the government were sustained, "the judicial procedure for the revocation of naturalization certificates would be pre-empted by administrative action." It seems to be thought that the nature of adversary proceedings of a judicial nature is such that the rights of the United States as petitioner in a denaturalization proceeding, as to discovery and other procedural matters, should be on a parity with those of the respondent therein, despite the special interest of the government in matters relating to immigration and naturalization and the undoubted power of the Congress to make provision for investi-

gations by government officials preliminary to the commencement of action in court. Moreover, it is said that Section 235(a) and Section 335(b), 8 U.S.C.A. § 1446(b), of the Act are duplicitous, and that this very alleged duplicity gives rise to an inherent ambiguity.

There is no question whatever about the fact that the investigations sought to be pursued by the issuance of these subpoenas are administrative in character and that a denaturalization proceeding is unqualifiedly judicial. But this presents no inconsistency; nor do we find that Sections 235(a) and 335(b) impinge upon one another in any way. Section 235(a) is purely administrative, as we have already observed. But Section 335(b) relates to proceedings for naturalization, which have since very early times been held to be judicial in character. The subpoena powers given in Section 335(b) are incidental to these judicial proceedings, and this is made clear by the language of the section to the effect that, upon a refusal by any person to obey a subpoena, any employee of the Service designated for the purpose by the Attorney General "may invoke the aid of any court exercising naturalization jurisdiction as specified in section 310 of this title; and any such court may, in the event of neglect or refusal to respond", require such person to appear and testify, and, upon further failure of compliance, punish for contempt. Section 310, 8 U.S.C.A. § 1421, enumerates the state courts as well as the federal courts in which judicial proceedings for naturalization may be instituted. Thus, the careful integration of the 1952 Act indicates that its several parts are closely articulated into a comprehensive, smoothly functioning whole. After the filing of a petition for naturalization, all examinations and investigations by the officers and employees of the Service designated for that purpose by the Attorney General are conducted pursuant to powers defined and described in Section 335(b). The statute and the subject matter of immigration and naturalization are sui generis; and the exercise of these administrative and judicial investigatory powers side by side and pari passu is, it seems to us, clearly envisioned by the pattern of the statute.

 That administrative investigations may be and are often intended to serve as preliminaries to adversary proceedings of a judicial character to which the United States is a party is more or less of a commonplace, where such investigations will serve the public interest. See, e.g., Internal Revenue Code 1954, § 7602, 26 U.S.C.A.; Atomic Energy Act, 42 U.S.C.A. § 1812(a) (3)*; Civil Aeronautics Act, 49 U.S.C.A. §§ 642, 644(b), 459, 487; Securities Act, 15 U.S.C.A. § 78u; Public Utility Holding Company Act, 15 U.S.C.A. § 79r. As stated by Mr. Justice Jackson, writing for the Supreme Court in United States v. Morton Salt Co., 338 U.S. 632, 642–643, 70 S.Ct. 357, 364, 94 L.Ed. 401 (1950):

"The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law."

* Now 42 U.S.C.A. § 2201.

In view of the broad general language of Section 235(a) it does not seem to us surprising that no reference is made in Section 340 to the administrative investigatory powers which the Service now seeks to exercise. Nor do we find anything improperly included in or omitted from the Regulations, now so clearly integrated with the various sections of the Act. There is no point in merely repeating in the Regulations something already apparent on the face of the statute. Naturally, the Regulations affecting "Procedural and Other Non-substantive Provisions" of Section 235(a) relate to the sort of detailed run-of-the-mill practical problems arising from day to day in connection with immigration inspections.

Moreover, Regulation § 340.11 [3] seems to tie in perfectly with the interpretation we have given of Section 235(a) as conferring new and broad administrative investigatory powers upon immigration officers delegated by the Attorney General to exercise these powers. Thus "whenever it appears that any grant of naturalization may have been procured by concealment or wilful misrepresentation, the facts shall be reported to the district director having jurisdiction * * *." Moreover, where the commission of a crime is indicated—a "violation of section 1425 of Title 18 of the United States Code"—the facts may be presented by the district director "to the appropriate United States Attorney for possible criminal prosecution;" but "[I]f the district director is satisfied that a prima facie showing has been made that grounds for revocation exist, he shall cause an investigation to be made and report the facts in writing to the Commissioner with a recommendation as to whether revocation proceedings should be instituted." The "investigation to be made" must of necessity be administrative in character; and it is noteworthy that additional protection to the naturalized citizen is afforded by the "report" and "recommendation" to the Commissioner, who in turn, but only after he decides, in the exercise of his judgment and discretion in the premises, that a civil action in equity for denaturalization should be brought, will forward the dossier or a summary thereof to the United States "district attorneys," who "upon affidavit showing good cause" are, according to the provisions of Section 340, to "institute proceedings" in the appropriate state or federal court to effect revocation of the certificate of naturalization. The articulation between the various sections of the Act and the Regulations is compact and in no way ambiguous or repetitious. No effort is wasted on unnecessary commentary; and provision is made for the very sort of administrative orderliness that it is the purpose of the Regulations to serve. Again and again is the administrative investigatory power of the Service recognized, and in the very matter of denaturalization proceedings under Section 340.

Broad policy considerations, plainly to be seen on the face of the Immigration and Nationality Act of 1952, are equally at variance with the narrow interpretation of Section 235(a) which is reflected in the orders appealed from.

Even as early as 1903 the Congress framed immigration laws which took cognizance of subversives, Act of March 3, 1903, c. 1012, 32 Stat. 1213. But in recent years infiltration, by the hirelings and conspiratorial agents of Communism, and by the propagandists and enthusiasts of that and other alien ideol-

---

3. "§ 340.11. *Investigation and report.* Whenever it appears that any grant of naturalization may have been procured by concealment of a material fact or by wilful misrepresentation, the facts shall be reported to the district director having jurisdiction over the naturalized person's last known place of residence. If the district director is satisfied that a prima facie showing has been made that grounds for revocation exist, he shall cause an investigation to be made and report the facts in writing to the Commissioner with a recommendation as to whether revocation proceedings should be instituted. If it appears that naturalization was procured in violation of section 1425 of Title 18 of the United States Code, the facts in regard thereto may be presented by the district director to the appropriate United States Attorney for possible criminal prosecution."

ogies equally repugnant to our free institutions, has become more and more troublesome and menacing. It must not be forgotten that the Subversive Activities Control Act of 1950, Act of September 23, 1950, c. 1024, Title 1, §§ 1–32, 64 Stat. 987, amended numerous sections of various immigration and naturalization laws, and most of these amendments have been incorporated into the 1952 Act with which we are now concerned. The findings relative to totalitarian dictatorship and the world communist movement which are found in Section 2 of the Subversive Activities Control Act of 1950, 50 U.S.C.A. § 781, have a direct bearing on the Congressional intent behind Section 235(a) of the 1952 Act; and one of the findings is especially significant. Section 2(14) of the 1950 Act states:

"One device for infiltration by Communists is by procuring naturalization for disloyal aliens who use their citizenship as a badge for admission into the fabric of our society."

Suffice it to say that there is abundant internal evidence in the Act of 1952, and those laws which have been integrated into its warp and woof, to indicate that the Congress in bringing together for the first time in our history all the laws regulating immigration and naturalization, into one extensive compilation, was particularly sensitive to the need for prompt and effective dealing with subversives. Again and again we find a steady strengthening of the investigatory powers of the Service,[4] and, where experience prior to the passage of the Act of 1952 disclosed the need therefor,

holes in previously existing laws were plugged and gaps were filled.[5] This was done so that the facts might be promptly ascertained and appropriate and expeditious action taken, not only by way of exclusion or deportation, but in the general administration and enforcement of the Act, applicable to the whole subject of immigration and naturalization as set forth therein.

This does not mean that the Falcones and Oddo are charged with or even suspected of subversion. Nothing in these records now before us indicates that any of the respondents has ever been engaged in or had any knowledge of subversive activities of any kind. Nor are they to be criticized for challenging the authority of the immigration officers to issue the subpoenas. They had a perfect right to do that. Furthermore, in so far as concerns the interpretation of Section 235(a), we may assume that they may well be exonerated at the conclusion of the investigations. But the answer to the question before us does not depend upon what may or may not be revealed in a particular case; and it is plain that the exercise of these increased administrative investigatory powers by immigration officers in ferreting out concealments and frauds connected with naturalization proceedings, will put the government in a position to deal more effectively with subversives.

■ Accordingly, we conclude that the increased administrative investigatory powers given by the terms of Section 235(a) of the 1952 Act were intended to relate to the enforcement of the Act as a whole, as stated therein, including the ascertainment of such facts as

4. E. g., Secs. 105, 235, 287, 335, 8 U.S.C.A. §§ 1105, 1225, 1357, 1446.

5. E. g., Sec. 101, 8 U.S.C.A. § 1101, clarified the definition of "entry" which had given the courts considerable difficulty in previous cases. See Delgadillo v. Carmichael, 1947, 332 U.S. 388, 68 S. Ct. 10, 92 L.Ed. 17 and Di Pasquale v. Karnuth, 2 Cir., 1947, 158 F.2d 878; Sec. 318, 8 U.S.C.A. § 1429, eliminated the anomalous situation confronting the court in United States ex rel. Walther v. District Director, 2 Cir., 1949, 175 F.2d

693. See United States ex rel. Jankowski v. Shaughnessy, 2 Cir., 1951, 186 F.2d 580; Sec. 243(c), 8 U.S.C.A. § 1253(c), specifically corrected the problem confronting the courts under the prior provision in United States v. Prince Line, Ltd., 2 Cir., 1951, 189 F.2d 386; Sec. 274, 8 U.S.C.A. § 1324, cures the omission, from the earlier statute, of penalty provisions for certain of the offenses described therein. The earlier defect was pointed out in United States v. Evans, 1948, 333 U.S. 483, 68 S.Ct. 634, 92 L.Ed. 823.

may tend to support a petition for denaturalization. The fact that deportation may follow denaturalization merely emphasizes further the reasonableness of the enlargement of powers of immigration officers which we find in Section 235(a).

We share the solicitude of the two able district judges below, that naturalized citizens be not harassed by subpoenas issued pursuant to legislation of doubtful applicability nor deprived of "the security of judicial over administrative action;" but we think the statute is free from ambiguity. Nor does it seem to us that the denaturalization suit, which may in some cases follow the administrative investigation provided for in Section 235(a), will lack any of the safeguards and protections which are commonly associated with judicial proceedings. Respondents will still have their sixty days to answer the petitions, should they be filed, together with the protection afforded by the Federal Rules of Civil Procedure, 28 U.S.C.A.; and they may still urge any constitutional objections to questions addressed to them by the immigration officers in the course of the investigations.

The orders appealed from are reversed; and the respective District Courts directed to proceed in accordance with this opinion.